REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **ARMSTRONG FLOORING, INC.,** *et al.,* | **Case No. 22-10426 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### DECLARATION OF JEFFREY LEWIS IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED PRIMING FINANCING AND TO USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; <u>AND (VI) GRANTING RELATED RELIEF</u>

I, JEFFREY LEWIS, hereby declare under penalty of perjury that the following is true and correct:

1.      My name is Jeffrey Lewis.  I am over the age of 18 and competent to testify.

2.      I am a Managing Director and a member of the Financial Restructuring Group at Houlihan Lokey Capital, Inc. (together with the other subsidiaries of its parent company, Houlihan Lokey, Inc., "**Houlihan Lokey**"), financial advisor to Armstrong Flooring, Inc. and its debtor affiliates (collectively, the "**Debtors**" or the "**Company**") in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**").

3.      I submit this declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Priming*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Armstrong Flooring, Inc. (3305); AFI Licensing LLC (3265); Armstrong Flooring Latin America, Inc. (2943); and Armstrong Flooring Canada Ltd. (N/A).  The address of the Debtors' corporate headquarters is PO Box 10068, 1770 Hempstead Road, Lancaster, PA 17065.

**REDACTED**

*Financing and to Use Cash Collateral; (II) Granting Liens and Superpriority Administrative*

*Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V)*

*Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "**DIP Motion**"),[2] which

seeks approval of $30 million in senior secured priming debtor-in-possession financing and

nonconsensual use of Cash Collateral.[3]

4.      The statements in this declaration are, except where specifically noted, based on

my personal knowledge or opinion, on information that I have received from the Debtors'

employees or advisors, or employees of Houlihan Lokey working directly with me or under my

supervision, direction, or control, or from the Debtors' books and records maintained in the

ordinary course of their businesses.  I am not being specifically compensated for this testimony

other than through payments received by Houlihan Lokey as a professional retained by the

Debtors.  If I were called upon to testify, I could and would competently testify to the facts set

forth herein on that basis.  I am authorized to submit this declaration on behalf of the Debtors.

## HOULIHAN LOKEY'S QUALIFICATIONS

5.      Houlihan Lokey is a publicly traded, internationally recognized investment

banking and financial advisory firm with expertise in mergers and acquisitions, capital markets,

financial restructuring, valuation and strategic consulting.  The firm serves corporations,

institutions, and governments worldwide from twenty-three offices located in the United States,

---

[2]    Capitalized terms used but not defined herein have the meanings given to such terms in the DIP
       Motion, First-Day Declaration, or the Interim Order, as applicable.

[3]    The material terms of the DIP Facility are set forth in detail in the DIP Motion and its exhibits.  Any
       description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to
       the DIP Documents.

3660982.2

REDACTED
Europe and the Asia-Pacific region.  Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

6.      Houlihan Lokey's Financial Restructuring Group, which has approximately 275 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers and other parties in interest involved in financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan Lokey has represented debtors in some of the largest restructuring cases in the United States, including:  *In re Briggs & Stratton Corporation*, No. 20-43597-399 (BSS) (Bankr. E.D. Mo. Aug. 19, 2020); *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Mar. 20, 2019); *In re Waypoint Leasing Holdings Ltd.*, No. 18-13648 (SMB) (Bankr. S.D.N.Y. Jan. 18, 2019); *In re Heritage Home Grp. LLC*, No. 18-11736 (KG) (Bankr. D. Del. Aug. 24, 2018); *In re Walter Inv. Mgmt. Corp.,* No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017); *In re Angelica Corp.*, No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Gawker Media LLC*, No. 16-11700 (SMB) (Bankr. S.D.N.Y. July 14, 2016); *In re Phoenix Brands LLC*, No. 16-11242 (BLS) (Bankr. D. Del. July 5, 2016); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); *In re Trump Ent. Resorts, Inc.*, No. 14-12103 (KG) (Bankr. D. Del. Oct. 6, 2014); *In re Northhampton Generating Co., LP*, No. 11-33095 (JCW) (Bankr. W.D.N.C. Jan. 3, 2012); *In re AES Thames, L.L.C.*, No. 11-10334 (KJC) (Bankr. D. Del. Mar. 30, 2011); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011); *In re Truvo USA LLC*, No. 10-13513 (AJG) (Bankr. S.D.N.Y Oct 12, 2010); *In re Premier Inter. Holdings, Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. Oct 8, 2009); *In re Aventine Renewable Energy Holdings, Inc.,* No. 09-11214 (KG) (Bankr. D. Del. June 19, 2009); *In re Foamex Inter.*

REDACTED

*Inc.*, No. 09-10560 (KJC) (Bankr. D. Del. Mar. 17, 2009); and *In re Buffets Holdings, Inc.*,

No. 08-10141 (MFW) (Bankr. D. Del. Mar. 12, 2008).

7.    I have over twenty years of restructuring experience, most recently as a Managing

Director at Houlihan Lokey, where I have executed numerous in-court and out-of-court

restructuring and special situations transactions while representing companies, creditors (or

committees of creditors), and other constituents across a wide spectrum of industries, including

financial services, real estate, transportation and logistics and general industrials.  Furthermore,

I have substantial experience marketing, structuring and evaluating debtor in possession

financings, secured debt, and exit financing, including assisting the debtors in the following

recent matters:  *In re Briggs & Stratton Corp.*, No. 20-43597-399 (Bankr. E.D. Mo. Aug. 20,

2020), *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 17, 2019), *In re*

*Orchids Paper Products Co.*, No. 19-10729 (MFW) (Bankr. D. Del. Apr. 1, 2019) and *In re*

*Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017).

8.    Prior to joining Houlihan Lokey in 2009, I spent approximately twelve years in

the restructuring practice at PricewaterhouseCoopers Corporate Finance LLC.  I hold a B.A. in

Government and a B.B.A. in Finance from the University of Texas, and an MBA in Finance and

Accounting from the Vanderbilt University Owen Graduate School of Management.

**HOULIHAN LOKEY'S RETENTION**

9.    Prior to the Petition Date, in October 2021 the Debtors engaged Houlihan Lokey

to act as the Debtors' lead financial advisor in connection with the Debtors' solicitation and

evaluation of offers for a potential strategic transaction, and Houlihan Lokey has been actively

assisting the Debtors in that effort to date.  In addition, beginning in April 2022, in anticipation

of the Debtors' Chapter 11 filing, Houlihan Lokey has assisted the Debtors' in soliciting and

**REDACTED**

evaluating proposals for DIP financing.  The Houlihan Lokey team under my supervision has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to this case and has become acquainted with the Debtors' assets, capital structure, liquidity needs, and business operations.

## THE PROPOSED DIP FINANCING

10.     After extensive negotiations, the Prepetition Lenders declined to provide DIP financing on terms sufficient to maintain the Company's ordinary-course operations to preserve and maximize value pending the completion of a orderly sale process in Chapter 11, and ultimately indicated that they would only support an immediate wind-down and liquidation.

11.     The Debtors therefore had to choose to either (a) immediately liquidate the Company's assets piecemeal, which would be value destructive, or (b) seek an organized sale process that maximizes the value of the Debtors' estates, but which comes with a "priming fight" with the Prepetition Lenders.  Based on projections developed by the Company and its financial advisor Riveron Consulting, LLC (**"Riveron"**) and Houlihan Lokey's internal analysis, I believe that proceeding with the Debtors' proposed 50-day Sale Process, rather than immediate liquidation, will best preserve and maximize the value of the Debtors' estates, and is the only alternative that offers any potential for recovery by the general unsecured creditors.  Based on the Company and Riveron's projections, which I believe to be reasonable, an immediate wind-down and liquidation would eliminate any possibility of recovery for general unsecured creditors.

12.     As set forth in the DIP Motion, the Debtors and their advisors determined that, in order to continue operations, fund an orderly sale process, and thereby preserve the value of their assets for the benefit of their creditors, access to DIP financing in the amount of $25-30 million

**REDACTED**

was required.  As discussed below, Houlihan Lokey conducted a marketing process over several weeks designed to solicit postpetition financing on the best available terms.  In connection with these efforts, Houlihan Lokey contacted six third-party sources of asset-based financing, negotiated NDAs, and granted access to a virtual data room to the party that ultimately became the DIP Agent.  Naturally, the Debtors and their advisors determined that the Prepetition Lenders should also be included in the solicitation and negotiation of postpetition financing solutions.  Despite the Debtors' best efforts to reach a consensual financing package with the Prepetition Lenders, they refused to support the Debtors' restructuring efforts, either through providing DIP financing at the required level on reasonable terms, or through consenting to priming liens in view of the substantial equity cushion they enjoy.

13.     I believe the Debtors negotiated with the DIP Lenders in good faith, extensively and at arm's-length, and I consider the terms of the DIP Facility fair and reasonable under the circumstances.  By the DIP Motion, the Debtors will be granted access up to $30 million of incremental liquidity and the use of the Prepetition Collateral, including Cash Collateral.  The DIP Facility provides the Debtors with up to $20 million on an interim basis, and the ability to draw the remainder of the $30 million commitment following entry of the Final Order.

14.     Based on projections reflected in the Approved Budget prepared by the Company and Riveron, I anticipate that the DIP Facility will provide the Debtors with sufficient funds to continue operating their businesses through the consummation of a sale within 50 days after the Petition Date.  The Debtors intend to use the sale proceeds to satisfy the DIP Obligations and Prepetition Lenders Obligations.  Following a sale, the Debtors will use the remaining sale proceeds to fund the costs of administration of these Chapter 11 Cases, including costs associated with pursuing a liquidating Chapter 11 plan and winding down the Debtors' estates.

**REDACTED**

## THE PREPETITION LENDERS
## HAVE A SUBSTANTIAL EQUITY CUSHION

15.    In my opinion, as set forth below, the Prepetition Lenders have more than a ▮▮▮
equity cushion.

16.    I believe the value of the Prepetition Collateral is at least ▮▮▮▮▮▮.  The value
of the Prepetition Collateral derives from two major components:  The Company's (1) North
American assets and (2) non-U.S. based assets.

17.    First, the Company has received a letter of intent from ▮▮▮▮▮▮▮▮▮ to
acquire substantially all of the Company's North American assets ("**North American Assets**"),
including the Company's machinery and equipment, inventory, intellectual property, accounts
receivable, and real estate, for ▮▮▮▮▮ ("▮▮▮ **LOI**").  ▮▮▮ has a deep understanding of
the North American Assets. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮[4]

18.    Importantly, the ▮▮▮ LOI contemplates ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮  Based on appraisals performed in the last 12

---

[4]   Importantly, ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.  If the Company were to
immediately cease operations as the Prepetition Lenders have proposed, the price that would be
offered by ▮▮▮ would be dramatically lower, if ▮▮▮ retained any interest at all.  Similarly, that
scenario would preclude the interest of any going concern bidder.

3660982.2

**REDACTED**

months by CBRE Valuation & Advisory Services (which was retained by the Prepetition

Lenders), the Company's North American real estate—which includes several plants and a

warehouse in Illinois, Mississippi, Pennsylvania, and Oklahoma—is worth approximately $70

million. These appraisals are attached hereto as **Exhibits 1 to 6**. ▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

19.    In my opinion, the purchase price set forth in the ▋▋ LOI represents the

baseline amount for the North American Assets based on interest I have seen over the last six

months. Since October 29, 2021, Houlihan Lokey has conducted a robust and extensive

marketing process for the Company's assets. Houlihan Lokey provided early-look meetings with

six potential buyers expressing early interest, and ultimately Houlihan Lokey contacted

74 prospective bidders. Of the 74 potential bidders, 47 were provided access to a confidential

information presentation and an option for limited access to a virtual dataroom. The Company's

management team conducted pre-bid presentations with 14 potential bidders to address targeted

diligence questions before the Company received five initial indications of interest. The

Company granted the most compelling bidders full access to the virtual dataroom, and certain

bidders conducted site visits at the Company's facilities throughout the world. By mid-March,

after substantial marketing efforts, the Company received two non-binding letters of intent, each

expressing interest in acquiring certain assets of the Debtors. Currently, as of the Petition Date,

**REDACTED**

in addition to the ▇▇▇ LOI, Houlihan Lokey is actively engaged with five other potential bidders for the whole company or its North American Assets. Based on the foregoing level of interest, I believe continuing the Sale Process postpetition will enhance the Company's chances of receiving a higher and better offer for its assets.

20.    Second, in my opinion, the Company's non-U.S. based assets, which are located primarily in China and Australia, are worth at least ▇▇▇▇▇▇. Houlihan Lokey performed a valuation of the Company's assets located in China and Australia using a discounted cash flow analysis and market comparables.[5] A summary of certain of our analyses is attached hereto as **Exhibit 7**. Based on this analysis, management's projections, and prior proposals received from third parties related to the Company's real estate, I believe the Company's assets located in China should be valued in a range between ▇▇▇▇▇▇▇, and the Company's assets located in Australia should be valued between ▇▇▇▇▇▇▇, which equates to a total valuation range for non-U.S. assets of ▇▇▇▇▇▇▇▇. To be conservative for the purpose of calculating the equity cushion, I believe the Australian assets can be valued at no less than ▇▇▇▇, and that the Chinese assets can be valued at no less than ▇▇▇▇. Furthermore, in connection with the Company's prepetition marketing process, it received significant interest in its assets located in China and Australia—both as part of a whole Company bid and segment bid for just these assets. Currently, as of the Petition Date, Houlihan Lokey is actively engaged with eleven potential bidders for the Company's assets in China and/or Australia.

---

[5]    Notably, the operations of the Company's Australian and Chinese subsidiaries are self-sufficient, so that even if the Company's North American Assets were liquidated and it ceased North American operations, the Australian and Chinese subsidiaries could continue as going concerns.

9

**REDACTED**

21.    The value of the Company's North American and non-U.S. assets thus totals at least ██████████ in my opinion.  As of the Petition Date, the aggregate amount owed to the Prepetition Lenders under the Prepetition ABL Credit Facility and Prepetition Term Loan Facility, including fees[6] and outstanding letters of credit (including a 5% premium) (collectively, the "**Prepetition Lender Obligations**"), plus equipment leases, was $163.3 million.  If the Court grants the DIP Motion, the DIP Obligations, including fees, will total up to $31.2 million.[7]  Thus, as of the Petition Date, the Prepetition Lenders will have an equity cushion equal to more than ██████ of the amount of the Prepetition Lender Obligations and DIP Obligations, calculated as follows:


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

---

[6]    For purposes of calculating the Prepetition Lenders' equity cushion, I have included the fees the Prepetition Term Loan Lenders charged the Debtors in connection with the Fourth Amendment to the Prepetition Term Loan Agreement.  I understand that the Debtors reserve their rights to challenge such fees under applicable law.

[7]    To be conservative for the purpose of calculating the equity cushion, I have assumed borrowing to the limit of the DIP Facility.  The Approved Budget, however, projects that the maximum actual borrowing under the DIP Facility will be somewhat under the limit.

**REDACTED**



| | |
|---|---|
| North America – ▮▮ Bid | ▮▮▮▮ |
| North America – Real Estate ▮▮ | ▮▮▮▮ |
| China | ▮▮▮▮ |
| Australia | ▮▮▮▮ |
| Asset Value of Company | ▮▮▮▮ |
| | |
| ABL Debt | $52,901,082 |
| Term Loan Debt | 90,513,165 |
| ABL Success Fee | 1,250,000 |
| Term Loan Make-Whole | 7,493,283 |
| Letters of Credit | 10,095,127 |
| Equipment Leases | 1,087,532 |
| DIP Loan, including fees | 31,200,000 |
| Total Secured Debt + DIP | $194,540,189 |
| | |
| Equity Cushion | ▮▮▮▮ |
| Cushion as Percentage of Secured Debt + DIP | ▮▮▮▮ |

## THE TERMS OF THE DIP FACILITY RESULTED FROM GOOD FAITH, ARM'S-LENGTH NEGOTIATIONS, AND ARE REASONABLE

22.     The DIP Facility is a critical component of these Chapter 11 Cases and the Company's restructuring efforts, and it is the product of extensive good-faith, arm's-length negotiations between the Debtors and their advisors on the one hand, and the DIP Lenders and their advisors on the other.

23.     The Debtors have agreed, subject to Court approval, to pay certain fees and expenses of the DIP Lenders pursuant to the DIP Loan Documents.  Specifically, the Debtors have agreed to pay (i) a Commitment Fee equal to 2% of the $30 million Commitment (i.e., $600,000) payable upon entry of the proposed Interim Order from the proceeds of the initial draw on the DIP facility, and (ii) an Exit Fee payable at maturity equal to 4% of the Commitment (i.e., $1.2 million).

---

8     Expressed as a percentage of asset value, the equity cushion is ▮▮▮▮.

**REDACTED**

24.     Based on my experience, these fees and costs are reasonable, customary, and appropriate under the circumstances, particularly in light of the consideration given therefor (including the $30 million commitment which should be sufficient to fund the Company through the completion of the Sale Process).  These fees and costs are also reasonable in comparison to the fees required by the Prepetition Lenders in proposals that they ultimately withdrew prior to this filing.

25.     Other key terms of the DIP Facility are more favorable to the Debtors than those included in the Prepetition Lenders' inadequate and now withdrawn proposals and are reasonable under the circumstances.  The DIP Facility carries a 10% interest rate and a 15% post-default rate.  The DIP Facility allows for 20% positive and negative variances from the budget measured every two weeks.

26.     The DIP Agreement also contains customary milestones that the Debtors must meet during these Chapter 11 Cases, including with respect to the proposed Sale Process, and failure to meet such milestones constitutes an Event of Default under the DIP Credit Agreement. These milestones were negotiated and required by the DIP Lenders as a condition to the DIP Facility in an effort to ensure the cases progress as expeditiously and effectively as possible.  As a result, I believe the milestones are reasonable.

## THE DEBTORS DO NOT HAVE READILY AVAILABLE SOURCES OF ALTERNATIVE FINANCING

27.     The Prepetition Lenders assert that they have liens on substantially all the Prepetition Loan Parties' assets, which, along with the Debtors' precarious liquidity position, restricts the availability of, and options for, postpetition financing.

28.     Before the Petition Date, beginning in April 2022, the Debtors, with the assistance of Houlihan Lokey, conducted a marketing process designed to secure postpetition financing on

12

REDACTED

the best available terms. In addition to the Prepetition Lenders, the Debtors solicited proposals

for DIP financing from six alternative third-party sources of asset-based financing (including

specialty lenders and those that routinely provide debtor-in-possession financing). The Debtors

received a DIP financing proposal from one of the six, JMB Capital Partners Lending, LLC

(together with the co-lenders for which it acts as agent, the "**DIP Lenders**") and thereafter

negotiated terms. Other than the DIP Lenders, however, none of the other third parties was

willing to provide DIP financing in any amount, let alone on terms more favorable than the DIP

Lenders. The other third parties cited various reasons why they were not willing to offer terms,

including not wanting to engage in a priming fight with the Prepetition Lenders.

29.    Despite tireless, good faith efforts by the Debtors and their advisors to obtain

consensual postpetition financing from the Prepetition Lenders, the Prepetition Lenders never

proposed financing on terms sufficient to maintain the Company's ordinary-course operations to

preserve and maximize value pending the completion of an orderly sale process in Chapter 11.

The proposals that the Prepetition Lenders did make (all of which were withdrawn prior to this

filing) carried highly restrictive conditions on the bidding process that would likely reduce the

price offered by ████, if ████ remained interested at all, and could discourage other third party

bidders from participating. Those proposals also carried higher fees and more restrictive

variance conditions. In any event, ultimately, the Prepetition Lenders declined to provide any

DIP financing for any orderly sale process at all, and instead advised that they would only

support an immediate wind down of the Company's operations and liquidation of its assets.

30.    Under these circumstances, I believe that the DIP Facility represents the best

option available to address the Debtors' immediate liquidity needs, and that the terms and

conditions of the DIP Facility are reasonable and appropriate under the circumstances. None of

**REDACTED**

the parties contacted (including the DIP Lenders) was willing to provide DIP financing on an unsecured, junior-lien, or *pari passu* basis.  The DIP Lenders were willing to provide the Debtors with postpetition liquidity only if they were provided with liens senior to the Prepetition Lenders. I do not believe that any other third party would be willing to provide any postpetition financing to the Debtors without a priming lien.

31.     For the foregoing reasons, I do not believe that alternative sources of financing with terms more favorable than those of the DIP Facility are readily available to the Debtors.

## CONCLUSION

32.     I believe that, given the circumstances, the process to obtain debtor-in-possession financing produced the best financing option available and that the terms of the DIP Facility are reasonable and appropriate.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

3660982.2

**UNREDACTED VERSION FILED UNDER SEAL**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Chicago, Illinois
      May 8, 2022

By: _____
Name: Jeffrey Lewis
Title: Managing Director
      Houlihan Lokey Capital, Inc.

15