**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* <br><br> ARMSTRONG FLOORING, INC., *et al.*, <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 22-10426 (MFW) <br><br> (Jointly Administered) <br><br> Related Docket No. 249 |

**DECLARATION OF MICHEL S. VERMETTE IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE RETENTION PLAN
AND (II) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Michel S. Vermette, hereby declare, under penalty of perjury to the best of my knowledge and belief, that:

1. I submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Implement Key Employee Retention Plan and (II) Granting Related Relief* (the "**Motion**"), filed contemporaneously with this Declaration. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors and their professionals, including, professionals working at my direction at Armstrong Flooring, Inc.[2]

2. I am the President and Chief Executive Officer ("**CEO**") of Armstrong Flooring, Inc. ("**Armstrong**") and its debtor affiliates (collectively, the "**Debtors**" or the "**Company**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Armstrong Flooring, Inc. (3305); AFI Licensing LLC (3265); Armstrong Flooring Latin America, Inc. (2943); and Armstrong Flooring Canada Ltd. (N/A). The address of the Debtors' corporate headquarters is PO Box 10068, 1770 Hempstead Road, Lancaster, PA 17065.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meaning ascribed to them in the Motion.

00029582.7

3. I joined Armstrong in September 2019. Prior to joining Armstrong, I served as President, Residential Carpet at Mohawk Industries, where I led market strategy, product development, manufacturing, and innovation of the residential carpet business in North America. I also served in leadership roles across Mohawk Industries' finance, sales and marketing, and business development operations, including President Mohawk Group, and Chief Financial Officer of Mohawk Industries' North American Flooring Unit. At Mohawk Group, I launched the first Certified Living Product in flooring, and the organization was recognized regularly for top product awards. I joined Mohawk Industries in 2002, when the company acquired Dal-Tile. I earned a bachelor's degree in Management Accounting at the University of Quebec, in Montreal, Canada.

4. As a result of my tenure as CEO, my review of relevant documents, and my discussions with other members of Armstrong's management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto. Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial condition. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me for my use in preparing this Declaration.

## OVERVIEW

5. The Company is a leading global producer of resilient flooring products for use primarily in the construction and renovation of commercial, residential, and institutional buildings. On April 1, 2016, the Company became an independent publicly-traded company when Armstrong

World Industries, Inc. ("**AWI**"), a public corporation, separated its Resilient Flooring and Wood Flooring businesses from its Building Products business. As a result of the spin-off, the Company and AWI each became independent, publicly-traded companies, with the Company owning and operating the Resilient Flooring and Wood Flooring segments, and AWI continuing to own and operate a ceilings business.

6. The Company's flooring products include, but are not limited to, vinyl composition tile, vinyl sheet, and luxury vinyl tile, which is the Company's fastest-growing resilient flooring product category. The Company sells its products in North American commercial and residential markets as well as in commercial markets in the Pacific Rim (primarily China and Australia). The majority of the Company's sales are in North America, where the Company is the largest producer of resilient flooring products.

7. In the North American commercial market, the Company's products are used in commercial and institutional buildings as well as single- and multi-family housing. In each sector, revenue opportunities come from both new construction and renovation of existing buildings. In the Pacific Rim, the Company's products are primarily used in the healthcare, education, and retail sectors.

8. The Company's customers include both specialty retailers as well as independent wholesale flooring distributors who resell the products to retailers, builders, contractors, installers, and others. The majority of the Company's sales are to distributors. The Company also maintains relationships with subcontractors' alliances, architectural and design firms, facility owners, national home centers, flooring retailers, major home builders, and retail buying groups.

9. As set forth more fully in the First Day Declaration, the Debtors commenced the Chapter 11 Cases to maximize the value of their estates for the benefit of their creditor

constituencies and other stakeholders through the Sale of their North American, Australian and Chinese assets. The Debtors believe that the implementation of an orderly sale process, under the supervision of the Court, will permit the Debtors to consummate a sale of all or substantially all of their assets and maximize the value of their estates for the benefit of all interested parties.

10. On May 13, 2022, the Debtors filed the *Motion of Debtors for (I) Order (A) Approving Bidding Procedures in Connection with the Sale of Certain or all of the Debtors' Assets; (B) Establishing Procedures for the Debtors to Enter into Stalking Horse Agreement with Bid Protections in Connection with a Sale of Certain or All of the Debtors' Assets; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Hearing to Consider any Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 141] (the "**Bid Procedures Motion**").

11. Following a hearing held on May 26, 2022, the Court approved a revised form of order for the Bid Procedures Motion [Docket No. 233] (the "**Bidding Procedures Order**"). Under the Bidding Procedures Order as revised, the Debtors are seeking to sell their North American, Chinese and Australian assets as going concerns, and bidders for each include going concern purchasers. The retention of the KERP Participants (*as defined below*) is critical to preserve and execute a going concern sale, and a subset of this group is required to execute a wind down in the event a liquidator is selected as the top bid.

12. The Sale Process builds on the Debtors' months-long prepetition marketing campaign and will include continued robust marketing followed by a competitive bidding process

to enable the Debtors to obtain the highest or otherwise best offer(s) for their business lines and assets (collectively, the "**Assets**"). The success of the Sales Process is heavily dependent on the Debtors' employees. Accordingly, in order to maintain their operations and maximize the Debtors' value as a going concern, while attempting to sell substantially all of their assets in these Chapter 11 Cases, the Debtors believe that it is crucial to retain and incentivize the Debtors' non-insider workforce in order to maximize value for all stakeholders to the fullest extent possible.

13. The Debtors developed the KERP in order to retain the most critical of their employees through the Sale Process, and to ensure that the Debtors have sufficient capacity to conduct the sale closings and an orderly wind down thereafter. As described further herein, the goals of the program are as follows:

- to retain key non-insider personnel throughout the Sale Process;
- to facilitate the successful sale of the Assets and conduct an orderly wind down thereafter; and
- to maximize the value of the Debtors' estates for the benefit of all stakeholders.

## KEY EMPLOYEE RETENTION PLAN

A. SUMMARY OF THE KERP.

14. The KERP provides retention payments (the "**KERP Payments**") to up to fifty (50) non-insider essential personnel (the "**KERP Participants**"). The KERP Payments range from eight percent (8%) to twelve percent (12%) of each KERP Participants' annual base salary. The purpose of the KERP is to ensure the retention of a small percentage of the Debtors' non-insider, management level employees through the conclusion of the Sales Process and wind down. The KERP Participants were selected by that the Debtors' executive leadership team, led by me, working together with Riveron and the Debtors' CTO. Together, we identified the KERP Participants as employees who are critical to the success of the Sale Process.

15. It is essential to the Debtors that the KERP Participants remain employed throughout the Sale Process in order to facilitate the Sale Process and the completion of tasks attendant to the Chapter 11 Cases. The KERP Participants include employees from various functions, including, but not limited to, product manufacturing and design, shipping and transportation, product management, marketing, finance, sales, human resources, and customer service. Given the compressed Sale timeline, it is unlikely that the Debtors will be able to recruit replacements for any KERP Participants that should leave the Debtors' workforce. Moreover, any such recruiting efforts would result in material additional investments of time and money to locate, recruit, hire, and train new employees, who would likely insist on increased compensation given the risk of joining a company operating under chapter 11 protection.

16. The KERP is tied to the current compensation of the covered personnel. The proposed payments are modest in size and are generally similar to various non-insider retention plans in other cases. The Debtors believe that the KERP is comparable to other approved plans, within the range of reasonableness, and is reasonable and appropriate under the facts and circumstances of these Chapter 11 Cases. The total estimated cost of the KERP, assuming all KERP Participants remain employed for the required periods, is approximately $745,000, which represents an average of approximately $14,900 per KERP Participant.

17. The KERP classifies KERP Participants into two groups, Long-Term Participants and Short-Term Participants. Short-Term Participants are required to remain employed through the closing of the sale of the North American Assets and will earn their retention payment under the KERP upon the closing of such sale or their termination without cause prior to such closing. KERP payments to Short-Term Participants, who comprise approximately thirty-eight percent (38%) of all KERP Participants, will total approximately $238,000. Long-Term Participants are

required to remain employed through the closing of the sale of the Chinese and Australian assets and the conclusion of an orderly wind down and will earn their retention payment upon the conclusion of such wind down or their termination without cause prior to such wind down conclusion.  KERP payments to Long-Term Participants, who account for approximately sixty-two percent (62%) of all KERP Participants, will total approximately $507,000.

18.     The KERP Participants are important to the Debtors' business and are particularly vital during the Chapter 11 Cases and the Sale Process.  However, these employees are neither officers nor members of the Debtors' executive leadership team.  They do not set corporate policy, control the Sale Process, or manage the Chapter 11 Cases.  The KERP Participants are not insiders of the Debtors.  Certain of the KERP Participants have titles of "Vice President," "Director" or "Manager" of a particular division.  However, none of the KERP Participants are officers of the Debtors.  The KERP Participants report, directly or indirectly, to the Debtors' officers and executive leadership team.

B.     **DEVELOPMENT OF THE KERP.**

19.     I worked collaboratively with the CTO and the Debtors' head of human resources, with input from Willis Towers Watson, a leading advisory consulting firm, and the Debtors' counsel, with the goal of structuring the KERP to ensure the continued employment of the most critical, non-insider employees.  The Debtors and their professionals based the KERP's proposed payments upon market comparisons within the bankruptcy context.  Market research was used in preparing the proposed KERP.

20.     The Debtors and these professionals reviewed the Debtors' employment requirements during the Sales Process and the Chapter 11 Cases and the attendant necessary features of retention plans.  The Debtors' professionals assisted the Debtors in designing the

KERP, keeping in mind the Debtors' goals of maximizing the value of the Debtors' assets through the Sale Process, enhancing the Debtors' financial condition, and ensuring effective management throughout the Chapter 11 Cases. The KERP was designed in a reasonable, cost-effective way to retain personnel essential to the success of the Sales Process and Chapter 11 Cases. The CTO, who has participated in the development of numerous retention plans in prior bankruptcy and distressed- company engagements, also worked closely with the Debtors to ensure that the KERP was comparable to prior plans and competitive within the Debtors' industry.

21. As part of the KERP development, the Debtors engaged with the existing pre-petition outside compensation consultant, Willis Towers Watson, to review the proposed KERP. While Willis Towers Watson was not engaged to formally design or assess the KERP relative to market, a Senior Director of the firm who has worked with the Debtors and their Board of Directors for many years, and who has worked on numerous post-petition retention programs in other Chapter 11 matters, consulted with members of Debtors' management about the KERP. During this consultation, Willis Towers Watson observed the proposed KERP seemed reasonable based on its understanding of the Debtors' current situation, and its consulting experience in other restructuring matters. In Willis Towers Watson's general experience, implementing reasonable and tailored KERPs can be an effective tool to align interests between debtors and their economic stakeholders.

C. SELECTING THE KERP PARTICIPANTS.

22. The Debtors selected the KERP Participants by determining which non-insider employees would play the most critical roles in facilitating the Debtors' Chapter 11 Cases and ensuring the success of the Sale Process, including the time period to be required for each KERP Participant. All of the KERP Participants possess institutional knowledge and skills that are

essential to the Debtors' restructuring efforts. Further, some of the KERP Participants have particularized knowledge such that it would be very challenging and inefficient to find an adequate replacement in a short timeframe. In my opinion, absent approval of the KERP, the Debtors likely will lose non-insider personnel who are critical to the success of the Chapter 11 Cases and the Sale Process.

23. The business reasons for implementing the KERP are straightforward. In developing the KERP, I and the CTO determined that implementation of the KERP is likely to maximize the value of their estates and ensure the success of the Sale Process. The assistance of the Debtors' key employees is essential to the successful going concern sale or orderly liquidation process, and to maximize the value of the Debtors' assets. As set forth above, the KERP Participants are the Debtors' employees who, due to their knowledge and skill in conducting the Debtors' business, are critical to retain throughout the Sale Process.

24. In addition, the KERP is objectively and demonstrably reasonable. The size of the KERP is reasonable in light of the size of the Debtors' estates, the nature of the Debtors' industry, and the likely benefit that the Debtors' estates will realize from a successful Sale Process resulting from the KERP Participants' efforts. Accordingly, there is ample business justification for implementation of the KERP.

25. The KERP Participants do not have a sufficiently close relationship with the Debtors such that they should be considered "insiders." The Debtors, as a manufacturer and retailer, conduct their operations through manufacturing facilities and offices. The KERP Participants are not officers or persons in control of the Debtors; rather, the KERP Participants include employees from various functions, including, but not limited to, product manufacturing and design, shipping and transportation, product management, marketing, finance, sales, human

resources, and customer service. Each of the KERP Participants is under the overall supervision and direction of the CTO and the Debtors' executive leadership team. The KERP Participants are not officers, board members, or participants in board meetings.

26. Some of the KERP Participants hold the title of "Vice President," "Director" or "Manager" as part of their title but they are not officers or "person[s] in control of the debtor"; rather, they are afforded the title as to their respective role in a particular division. None of the KERP Participants take part in the overall management of the Debtors, and none of them direct or implement company policy. Rather, the KERP Participants are essential employees who have the knowledge and experience to carry out the decisions of the Debtors' executive leadership team and CTO in an efficient and effective manner. However, the KERP Participants do not manage or control the Debtors' business. Therefore, I am advised that they are not "insiders" and, accordingly, the prohibitions and restrictions in sections 503(c)(1) and (2) of the Bankruptcy Code do not apply.

27. The KERP Participants could face—and, upon information and belief, certain employees already have faced—significant pressure to leave their jobs with the Debtors due to perceived uncertainty and concern over their job prospects. I recognize that the filing of the Chapter 11 Cases unfortunately may have exacerbated employment concerns for the very personnel charged with maximizing the value of the Debtors' estates. As a result, it is appropriate to provide the modest proposed retention benefits to such key employees through the KERP to ensure their retention and assuage their fears. It is critical to the Debtors' Sale Process that the Debtors retain the services of the KERP Participants for the periods contemplated by the KERP.

28. The KERP was designed to motivate the KERP Participants to continue as employees of the Debtors and preserve the Debtors' day-to-day operations and affairs as well as

to implement the other goals of the KERP including retaining as many of the KERP Participants as possible at least through the closing of the sales and, as applicable, the orderly wind-down of the Debtors' operations. The KERP fairly compensates the KERP Participants for the increased demands placed upon them in connection with these Chapter 11 Cases, thereby maximizing the value of the Debtors' chapter 11 estates for the benefit of all parties in interest. The KERP was designed by the Debtors, their advisors and counsel, taking into account such factors as (a) comparisons with similar retention plans of other comparable companies; (b) industry standards; (c) appropriate due diligence necessary to design and implement the KERP; and (d) independent advice from professionals.

29. Accordingly, I respectfully submit that the KERP is justified by the facts and circumstances of these Chapter 11 Cases, the KERP is a sound exercise of the Debtors' business judgment, and implementation of the KERP is in the best interests of the Debtors, their estates, creditors, and all other stakeholders.

30. I believe that the Debtors' implementation of the KERP is essential to the success of the Chapter 11 Cases.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 31, 2022

By:     *Michel S. Vermette*
Michel S. Vermette
President and Chief Executive Officer
Armstrong Flooring, Inc.