**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ARMSTRONG FLOORING, INC., *et al*.,<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 22-10426 (MFW)<br><br>(Jointly Administered)<br><br>**Hrg. Date: March 28, 2023 at 11:30 a.m. (ET)**<br>**Obj. Due: March 21, 2023, at 4:00 p.m. (ET)**<br><br>**Related Docket No. 1249** |

## DEBTORS' OPPOSITION TO MEXICHEM SPECIALTY RESINS, INC.'S MOTION TO CONVERT DEBTORS' CHAPTER 11 CASES TO CHAPTER 7

The above-captioned debtors and debtors-in-possession (the "**Debtors**"), by and through their undersigned counsel, hereby respectfully submit this opposition (the "**Objection**") to *Mexichem Specialty Resins, Inc.'s Motion to Convert Debtors' Chapter 11 Cases to Chapter 7* (the "**Conversion Motion**") [Docket No. 1249].   In support of this Objection, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.　　　Dismissal of the Debtors' Chapter 11 Cases, not conversion to chapter 7, is in the best interests of creditors and the Debtors' estates.  The Debtors have been candid with the Court and all parties in interest that a plan is not feasible and have efficiently and expeditiously administered the Chapter 11 Cases to maximize recoveries for administrative creditors with the intention of pursuing a structured dismissal.   As such, concurrently with the filing of this Objection, the Debtors have filed their *Motion for Entry of an Order (I) Approving Procedures for the Dismissal of the Debtors' Chapter 11 Cases, (II) Authorizing the Debtors to Make Distributions to Claimants Holding Allowed Administrative Claims; (III) Establishing*

00045114.7

*Procedures with Respect to Final Fee Applications; (IV) Directing the Debtor Entities to be Dissolved; and (V) Granting Related Relief* (the "**Dismissal Motion**") [Docket No. 1284].

2.    As set forth more fully in the Dismissal Motion, which is incorporated herein by reference, the Debtors have considered all potential alternatives to bring these Chapter 11 Cases to a value maximizing conclusion and have determined that a structured dismissal of these Chapter 11 Cases is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs and maximize recoveries for holders of allowed administrative claims.

3.    The issue before the Court is not whether "cause" exists under section 1112(b) of the Bankruptcy Code, but whether dismissal or conversion is in the best interests of the Debtors' creditors and their estates.  Considering the facts and the record of these Chapter 11 Cases, there can be no dispute that dismissal, as provided for in the Dismissal Motion, and not conversion, is in the best interests of the Debtors' creditors and their estates.  As detailed more fully in the Dismissal Motion, the Debtors' assets have been liquidated, substantially all the administrative, priority and secured claims filed in the Chapter 11 Cases have been reconciled or are the subject of the Debtors' currently pending objections, and the Debtors are well down the path of pursuing (and resolving where possible) avoidance actions and other collections.  Indeed, bringing the pending avoidance actions to conclusion and distributing the net proceeds to holders of allowed administrative claims is essentially all that remains for the Chapter 11 Cases. Conversion of the Chapter 11 Cases to chapter 7 would dilute and delay distributions to holders of administrative claims and would not result in either a faster or improved recovery for administrative creditors.

4.    Finally, compelling circumstances exist such that, in accordance with section 1112(b)(3) of the Bankruptcy Code, the Court should defer ruling on the Conversion Motion

until it may be considered together with the pending Dismissal Motion, and then deny the Conversion Motion in favor of the structured dismissal proposed by the Dismissal Motion.

## BACKGROUND

### A.    GENERAL BACKGROUND.

5.    On May 8, 2022 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Court, thereby commencing these cases (the "**Chapter 11 Cases**").  The Chapter 11 Cases are being jointly administered.

6.    The Debtors continue to manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    On May 18, 2022, the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Committee**") [Docket No. 175].

8.    On June 3, 2022, the Court entered an order [Docket No. 284] authorizing and directing the U.S. Trustee to appoint a committee of retired employees pursuant to section 1114 of the Bankruptcy Code.

9.    Additional factual background regarding the Debtors, including their former business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in the *Declaration of Michel S. Vermette in Support of Chapter 11 Petitions and First-Day Papers* [Docket No. 16] (the "**Vermette Declaration**"), which was filed on the Petition Date and is incorporated herein by reference.

**B.      COURT AUTHORIZED SALES OF ASSETS.**

10.     Following a hearing on July 12, 2022, the Court entered orders on July 13, 2022 [Docket Nos. 549, 550 and 551], authorizing the Debtors to sell their major assets in three separate sale transactions: (i) the Debtors' North American assets (the "**North America Sale**") were sold to AHF, LLC ("**AHF**") and Gordon Brothers Commercial & Industrial, LLC (together, the "**AHF/GB Consortium**"); (ii) the Debtors' Australian assets (the "**Australia Sale**") were sold to Braeside Mills Operations Pty Ltd (formerly known as Braeside Mills Investments Pty Ltd), Gippsland Lakes Victoria Holdings Pty Ltd, and HS McKendrick Family Nominees Pty Ltd as trustee of the Mills Unit Trust; and (iii) the Debtors' equity in their China business (the "**China Sale**") was sold to Zhejiang GIMIG Technology Co., Ltd.  The Debtors closed the North America Sale to the AHF/GB Consortium on July 22, 2022.  The Australia Sale and China Sale each closed in August, 2022.

11.     After the major asset sales were completed, the Debtors were left with various miscellaneous *de minimis* assets.  The Debtors obtained approval of streamlined, cost-effective procedures for the disposition of the remaining assets, with increasing degrees of prior notice and formality dependent upon the size of the proposed sale (the "**DMAS Order**").[1]  The Debtors have since conducted at least five separate *de minimis* sales under the approved procedures, which are reflected in orders approving each of the transactions.[2]  In addition, the proposed sale

---

[1]     *See Order (I) Approving Procedures For The Sale Of De Minimis Assets Free And Clear Of Liens, Claims, Interests, And Encumbrances, (II) Approving The Sale Of De Minimis Assets Free And Clear Of Liens, Claims, Interests, And Encumbrances In Accordance With Such Procedures, And (III) Granting Related Relief* [D.I. 721].

[2]     *See, e.g.*, *Order Approving Miscellaneous Asset Sales* (Docket No. 801, Entered 9/12/22); *Order Approving Miscellaneous Asset Sales* (Docket No. 848, Entered 9/21/22); *Order Approving Miscellaneous Asset Sales* (Docket No. 904, Entered 10/11/22); *Order Approving Miscellaneous Asset Sales* (Docket No. 926, Entered 10/17/22); and *Order (A) Approving Transactions with Montebello Distribution Associates Regarding (I) Abandonment of Machinery and Equipment, (II) Rejection of Executory Lease of Non-Residential Real Property, and (B) Granting Related Relief* (Docket No. 1007, Entered 11/21/22).

of the Debtors' parcel of nonresidential real property in Lancaster, Pennsylvania (the "**Loop Rd. Property**"), is scheduled to be considered by the Court at the March 28, 2023 hearing.[3]   The Debtors have also entered into several prior amendments to the North American Sale asset purchase agreement with the AHF/GB Consortium to, among other things, document the sale of certain *de minimis* assets.

## C.    THE DEBTORS' ADDITIONAL EFFORTS TO MAXIMIZE VALUE.

12.    As detailed in the Dismissal Motion, in addition to liquidating substantially all of the Debtors' assets, the Debtors have focused on (i) evaluating, objecting to, and reconciling substantially all administrative claims, including section 503(b)(9) claims, and (ii) pursuing Avoidance Actions for the benefit of allowed administrative claim holders.

13.    On January 23, 2023, the Debtors filed the *Debtors' First Omnibus Objection to Claims (Substantive)* [Docket No. 1097] (the "**First Omnibus Objection**"), which was approved by order [Docket No. 1225] on February 23, 2023.  On February 24, 2023, the Debtors filed: (i) *Debtors' Second (Non-Substantive) Omnibus Objection to Claims Pursuant to Bankruptcy Code Section 502, Bankruptcy Rule 3007, and Local Rule 3007-1* [Docket No. 1231] (the "**Second Omnibus Objection**"); and (ii) *Debtors' Third Omnibus Objection To Claims (Substantive)* [Docket No. 1232] (the "**Third Omnibus Objection**" and together with the First Omnibus Objection and the Second Omnibus Objection, the "**Omnibus Objections**"), which were approved by orders on March 21, 2023 [Docket Nos. 1282, 1283].  In addition, the Debtors have resolved or otherwise reconciled administrative claims with at least 15 claimants by stipulation

---

[3]  *See Debtors' Motion for Order (I) authorizing the Private Sale of Certain Nonresidential Real Property Located in Lancaster, Pennsylvania Free and Clear of All Liens, Claims, Encumbrances and Other Interests, and (II) Granting Other Related Relief* [Docket No. 1258].

or stipulated orders (the "**Stipulated Claims**") [*see* Docket Nos. 880, 891, 986, 1184, 1191, 1194, 1197, 1203, 1210, 1228, 1230, 1236, 1253, 1264 and 1281].  Collectively, the Omnibus Objections and Stipulated Claims will have reduced the administrative claims pool in these Chapter 11 Cases from approximately $35 million to the current amount of $22 million.[4]

14.     Importantly, in reaching agreement with the creditors who are parties to the Stipulated Claims, the Debtors have obtained the express consent of such creditors to the Debtors' intended exit from Chapter 11 through a structured dismissal of the Chapter 11 Cases. These creditors, whose Stipulated Claims total approximately $10.5 million, have explicitly agreed with the Debtors to accept payment on their administrative claims at the same time and in the same manner as all other similarly-situated allowed claims in connection with the dismissal of the Chapter 11 Cases.  The Stipulated Claims have been approved by the Court.  The Debtors likewise have the consent and support of the Committee and one of their prepetition and postpetition lenders (the "**Lenders**") to the Debtors' proposed structured dismissal in lieu of a conversion to Chapter 7.[5]

15.     The Debtors have sought to ease the burden on administrative creditors through, *inter alia*, using a streamlined administrative expense claim form and active engagement with administrative creditors to reconcile their claims.  At the same time, and with input from the Committee, the Debtors have focused on creating value for claimholders through the efficient liquidation of avoidance claims.  The Debtors engaged ASK LLP ("**ASK**") as special counsel to investigate, prosecute, and recover potential avoidance action claims (the "**Avoidance Actions**") on a contingency fee basis.  On November 1, 2022, the Court entered the *Order Authorizing*

---

[4]   The foregoing amount excludes amounts owed to the Lenders which the Debtors are currently reconciling.

[5]   The second Lender takes no position on the relief requested.

*Retention and Employment of ASK LLP as Special Counsel to Pursue Avoidance Actions* [Docket No. 960]. ASK began sending demand letters that same day.

16.    To permit the Debtors to maximize the value of Avoidance Actions, the Debtors sought and obtained approval of procedures to permit approval of settlements of Avoidance Actions in a streamlined and cost-effective manner. *See Order on Motion for Approval of Procedures Regarding Settlements of Avoidance Claims Pursuant to Bankruptcy Rule 9019(b)* [Docket No. 1005]. To date, the Debtors have settled 48 avoidance actions, realizing a total of $590,893.90 in cash proceeds as well as negotiated reductions in certain administrative claims. *See* Notices of Settlement of Potential Actions, Docket Nos. 1100, 1212, and 1270. In addition, the Debtors have approximately 47 remaining Avoidance Actions pending to recover avoidable transfers pursuant to sections 547, 548 and 550 of the Bankruptcy Code, addressing as much as $21.5 million in potential recoveries. Importantly, the Lenders have waived any liens or claims against Avoidance Actions or the proceeds thereof, enhancing the value thereof for other holders of Allowed Administrative Claims.[6]

17.    To encourage and facilitate the resolution of Avoidance Actions prior to trial, the Debtors have also filed a motion to approve mediation procedures and stay of discovery pending completion of mediation. *See Motion for an Order Establishing Streamlined Procedures Governing Adversary Proceedings* [Docket No. 1244]. As proposed, Avoidance Actions that have not settled by May 31, 2023, will be referred to mediation, and mediations shall conclude by October 2, 2023. The Debtors are optimistic that most Avoidance Actions will be resolved by

---

[6]    *See Supplemental Order To Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing The Debtors To Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (Docket No. 581) at 10.

the conclusion of the proposed mediation period, thereby facilitating the distribution of proceeds and dismissal of the remaining Chapter 11 Case.

## OBJECTION

18.     Upon the request of a party in interest, section 1112(b)(1) of the Bankruptcy Code provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11 bankruptcy case (or convert such case to a case under chapter 7) "for cause."  *See* 11 U.S.C. § 1112(b)(1).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 changed the statutory language with respect to conversion or dismissal from permissive to mandatory.  *See* H.R. Rep. No. 109-31(1), at 442, reprinted in 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances.").

19.     The amendments to section 1112 of the Bankruptcy Code thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause.  *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.").

20.     The Debtors do not dispute the existence of cause pursuant to section 1112(b) of the Bankruptcy Code such that it is appropriate for this Court to dismiss the Chapter 11 Cases as contemplated by the Dismissal Motion.  In fact, the Debtors advised the Court about this reality at the Status Conference when the Debtors explained that their decision to withdraw the pending motion to extend the exclusivity period was due to the inability to confirm a plan resulting from the insufficiency of sale proceeds with which to satisfy the Debtors' post-petition DIP financing. Accordingly, cause under section 1112(b) of the Bankruptcy Code is not disputed.  The issue

before this Court is whether dismissal or conversion is the appropriate remedy. For the reasons more fully explained below, and in the Dismissal Motion, the Debtors submit that dismissal (and not conversion to cases under chapter 7) is in the best interests of the Debtors, their creditors, and their estates.

A.    **DISMISSAL IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS AND THEIR ESTATES.**

21.    Section 1112(b) of the Bankruptcy Code mandates that once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must evaluate whether dismissal or conversion is in the best interests of the debtor's creditors and the estate. 11 U.S.C. § 1112(b); *see, e.g., In re Superior Siding & Window*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert."); *In re Mazzocone*, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995) ("There is no dispute by any party regarding the presence of sufficient 'cause' to dismiss or convert this case from a Chapter 11 case …. Therefore, the only issue before us is determining whether conversion or dismissal best satisfies the [best interests of the creditors test]." Here, a variety of factors demonstrate that dismissal of these Chapter 11 Cases is in the best interest of the Debtors' estates and their creditors.

22.    First, a dismissal of a chapter 11 bankruptcy case meets the "best interests of creditors" test where a debtor has nothing to reorganize and its assets are fixed and liquidated. *See Camden Ordinance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordinance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (approving dismissal where reorganization not feasible after debtor's business ceased operations); *Royal Trust Bank, N.A. v. Brogdon Inv. Co. (In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the

reorganization).  Here, the Debtors have no business left to reorganize because they have sold substantially all of their assets and operations to the respective purchasers in the North America Sale, the Australia Sale and the China Sale.  Additionally, substantially all of the Debtors' remaining assets have been liquidated in accordance with the DMAS Order or are in the process of collection.  The Debtors are pursuing several additional recoveries, including (a) a potential reimbursement of certain prepetition litigation expenses paid by the Debtors in connection with certain insured claims, and (b) a potential reversion to the Debtors that may be available following the completion of the termination of the qualified defined benefit pension plan, an audit by the Pension Benefit Guaranty Corporation, and all other required plan audits and regulatory filings.  The latter item is being handled by the Debtors' special pension counsel, Groom Law.  The Debtors are not aware of additional material unliquidated assets other than the Avoidance Actions and the additional potential recoveries which the Debtors are currently pursuing.

23.    Second, dismissal is appropriate because the alternative – conversion to a chapter 7 case and appointment of a chapter 7 trustee – is (a) unnecessary and would provide no benefit to creditors, (b) would likely impose significant additional administrative costs upon the Debtors' estates, and (c) would further delay distributions to holders of allowed administrative claims.  Specifically, other than concluding the Avoidance Actions by ASK and completing certain collections efforts, the Debtors are not aware of any remaining assets with material value that are left to be liquidated and that warrant the appointment of a chapter 7 trustee.  Further, ASK has been retained on a contingency fee basis to pursue the Avoidance Actions, and a chapter 7 trustee and its counsel would incur unnecessary additional fees and create a duplication of efforts as ASK is already familiar with the specifics of each of the Avoidance Actions.  As a

result, creditors would not receive greater recoveries in a chapter 7 liquidation, and in fact, the costs of a chapter 7 liquidation likely would only result in additional, unnecessary Chapter 7 administrative expenses, with structural priority over the administrative expenses incurred in the Chapter 11 Cases, thereby further reducing recoveries.   Conversion to chapter 7 would also further delay distributions to holders of allowed administrative claims as a chapter 7 trustee would need to spend time familiarizing itself with the Debtors' estates and these cases and may decide to commence a traditional investigation to do so.

24.    Third, courts have found that dismissal is in the "best interests of creditors" where an interested party, other than the debtor, supports the dismissal of the debtor's chapter 11 case. *See In re Goodrich Quality Theaters, Inc.,* 2020 Bankr. LEXIS 2452, at \*5-\*6 (Bankr. W.D. Mich. 2020) (finding that conversion was not in best interest of creditors based upon views expressed by creditors' committee, undersecured lender and debtor, debtor's pending dismissal motion, and likelihood that conversion would increase costs and creditor confusion); *Camden Ordinance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. E.D.Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7 where debtor and U.S. Trustee both favored dismissal). The Debtors have consulted throughout the Chapter 11 Cases with the Lenders and the Committee regarding the status of the Chapter 11 Cases and the likelihood of a dismissal.  The Committee and one Lender, through counsel, have advised the Debtors' undersigned counsel that they support dismissal rather than conversion to chapter 7.  Furthermore, as set forth above, almost half (approximately $10.5 million) of the remaining administrative claimants have agreed as part of the Court-approved Stipulated Claims to be paid "at the same time and in the same

manner as all other similarly-situated allowed claims in connection with the dismissal of the Chapter 11 Cases."

25.     Fourth, a court may find dismissal to be in the "best interests of the creditors" where a debtor demonstrates the ability to oversee its own liquidation. *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone*, 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to … perform its own liquidation … should a debtor be permitted to remain in bankruptcy…..").  *See also Goodrich Quality Theaters*, *supra* (finding that debtor's unblemished service as fiduciary during chapter 11 case supported dismissal rather than conversion).  Here, the Debtors have demonstrated their ability to liquidate their assets through multiple Court-approved sales and the settlement to date of numerous Avoidance Actions.  Upon the monetization of the Avoidance Actions, the Debtors will be positioned to distribute the net proceeds to allowed administrative claims in accordance with the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).  Furthermore, the Debtors' board has approved the structured dismissal and distribution proposed in the Dismissal Motion.

26.     Under the circumstances of these cases, a structured dismissal as contemplated by the Dismissal Motion will maximize the value of the Debtors' estates and is in the best interests of the Debtors' creditors and estates.  The alternative, conversion to a chapter 7 liquidation and appointment of a trustee, would provide no benefit to creditors and would impose significant administrative costs and delays upon the Debtors' estates without any meaningful source of funds to satisfy such costs.

**B.     MEXICHEM'S ARGUMENTS FOR CONVERSION LACK MERIT AND MUST BE CONSIDERED IN LIGHT OF MEXICHEM'S INEQUITABLE CONDUCT.**

27.     In the Conversion Motion, Mexichem fails to provide any meaningful discussion of the merits of its proposed conversion as compared to dismissal.  Indeed, Mexichem's

arguments demonstrate that the Conversion Motion lacks merit and should be denied, particularly in light of the favorable payoffs received by Mexichem from the Debtors and one of the North American asset purchasers, which put Mexichem in a far more favorable position than other estate creditors.[7]

28.    As a threshold matter, Mexichem's postpetition claims appear to have been paid in full.  Mexichem fails to disclose in its Conversion Motion that it received an approximately $1.7 million postpetition payment from AHF.  According to its proofs of claims, Mexichem incurred $2,565,778.47 in unpaid amounts for postpetition product, and was paid $1,188,656.48 by the Debtors, leaving a postpetition receivable of $1,377,121.99.[8] The AHF payment should have *fully satisfied* Mexichem's alleged open postpetition invoices and reduced Mexichem's alleged Section 503(b)(9) claim from $614,570.00 to $298,663.99.[9]    Instead, Mexichem allegedly and conveniently applied $896,798.00 of the AHF payment to Mexichem's prepetition general unsecured claim.  General unsecured claims will receive no recovery in these cases. Accordingly, Mexichem's application of the AHF payment and continued assertion of postpetition administrative and Section 503(b)(9) claims totalling $1,195,462.38 prejudices other similarly-situated creditors and undermines, if not negates, the basis of the Conversion Motion.[10]

---

[7]   The Debtors continue to investigate these unauthorized offsets and reconciliations by Mexichem and other alleged administrative creditors, and expressly reserve all of their rights with respect to such actions, including the Debtors' right to seek actual and punitive damages for any violations of the automatic stay.

[8]   *See* Proof of Claim 10821, Ex. 2 (stating "Buyer [AHF LLC] agrees to pay Seller [Mexichem] $1,693,028 of the total outstanding amount that Armstrong Flooring, Inc. ("AFI") owes Seller.").

[9]   In the Conversion Motion, Mexichem asserts that it is presently owed $1,195,462.38 on account of post-petition and Section 503(b)(9) amounts. Conversion Motion ¶ 11.

[10]  The undisclosed AHF payment to Mexichem was, in effect, a cure payment under Bankruptcy Code section 365(b), but not framed as such because Mexichem's contract was rejected after AFH declined to take it by assignment.  Nor was the AHF payment a purchase of Mexichem's prepetition unsecured claim; the docket reflects no filed notice of transfer of claim pursuant to Bankruptcy Rule 3001.  Despite not assuming the Mexichem agreement as a technical matter, AHF included Mexichem on a list of vendors that AHF designated for protection

Stated differently, the Debtors believe that Mexichem's recovery in the Chapter 11 Cases is better than any other trade creditor, and the fact that only Mexichem has moved to convert the Chapter 11 Cases is telling indeed.  On March 7, 2023, the Debtors filed the *Debtors' Second Notice of Satisfied Claims* [Docket No. 1248] (the "**Notice of Satisfaction**") setting forth the Debtors' position that Mexichem's purported unpaid post-petition administrative expense claims have been satisfied in full.[11]

29.     Nor do Mexichem's citations in its Conversion Motion support the relief it seeks here.  Specifically, Mexichem cites to a motion to convert filed by the debtor in *In re HDR Holding*, *Inc.*, *see* Conversion Motion at 9, but the Debtors here oppose conversion, for the reasons stated herein and in the Dismissal Motion.  Mexichem also cites to *In re Forever21, Inc.*, *see id.* at 10, but in that case, the Court ultimately granted the debtors' motion to approve a structured dismissal.  *See In re Forever 21, Inc.*, Case No. 19-12122 (Bankr. D.Del. 2019), *Order (I) Dismissing The Remaining Chapter 11 Case, (II) Authorizing The Dissolution Of The Remaining Debtor, And (III) Granting Related Relief* dated February 17, 2023 [Docket No. 2457].  Mexichem also complains that the Debtors have not successfully negotiated a settlement with Mexichem, *see* Conversion Motion at 10, but that argument is baseless; as Mexichem explains in the same paragraph, no settlement has been reached precisely because Mexichem insists upon "payment in full" of its alleged administrative expense claim.

---

from avoidance actions.

[11] Pursuant to Rule 3007-1(J)(2) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), "An objection to a claim on the basis that the claim has been paid or satisfied postpetition is not a valid objection."  Accordingly, the Mexichem claims were included on the Notice of Satisfaction because the Local Rules forbade inclusion on the Omnibus Objections.  This Court has jurisdiction to determine the allowed amount, if any, of claims asserted against the Debtors, and to take into consideration whether such claims have been satisfied by payments made by non-debtor parties.  *E.g.*, 11 U.S.C. §§ 105, 502(b), 508.

30.     Finally, the Debtors must respond to Mexichem's unwarranted *ad hominem* attacks on the advisors in the Chapter 11 Cases.  The Debtors' postpetition payments to retained advisors have been in accordance with the Court's orders, including the orders approving the DIP financing and establishing the standard professional fee carve-out as well as the final financing pursuant to which the Lenders contributed proceeds of the sale of their collateral to fund the orderly wind-down of the Chapter 11 Cases. The retained advisors that continue to be subject to the Interim Compensation Order have been paid through the professional fee escrow, an integrated component of the Court-approved Carve Out.  Mexichem did not object to any of the financing motions or professional fee applications in the Chapter 11 Cases, nor did it appeal from any of the Court's orders approving the same.

31.     For the reasons set forth above and in the Dismissal Motion, the Conversion Motion lacks merit and should be denied.

**C.      THE COURT SHOULD ADJOURN THE HEARING ON THE CONVERSION MOTION SO THAT IT MAY BE CONSIDERED WITH THE DISMISSAL MOTION.**

32.     Section 1112(b)(3) of the Bankruptcy Code provides that the "court shall commence the hearing on a motion under this subsection not later than 30 days after the filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time *or compelling circumstances prevent the court from meeting the time limits established by this paragraph*." 11 U.S.C. § 1112(b)(3) (emphasis added).

33.     Rule 2002(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") requires that 21-days' notice of a hearing on the dismissal or conversion of a chapter 11 case be provided to "the debtor, the trustee, *all creditors* and indentured trustees" by mail. (Emphasis added).  *See also* Local Rule 2002-1(b).

34.    If the Court is not inclined to simply deny the Conversion Motion outright, the Debtors submit that compelling circumstances exist for this Court to defer ruling on the Conversion Motion so that it may be considered together with the Dismissal Motion. *See, e.g., In re Wolper Constr. Co.*, 2009 Bankr.LEXIS 2595 (Bankr. D. Utah 2009) (finding that compelling circumstances existed due to the court's workload and issues related to a pending sale motion in the case to prevent the court from deciding the motion within the 15 days required by section 1112(b)(3)); *In re SageCrest II LLC*, 2010 Bankr.LEXIS 4592 (Bankr. D.Ct. 2010) (finding that "compelling circumstances" under section 1112(b)(3) existed where movant's pending discovery requests, and the court's time constraints, justified an extension to the 30-day time limit; the court also found compelling circumstances to defer trial under section 105(a) of the Bankruptcy Code).

35.    As an initial matter, as set forth above and more fully in the Dismissal Motion, the dismissal of the Chapter 11 Cases is in the best interests of the Debtors' creditors and estates. The Dismissal Motion is currently scheduled for April 11, 2023.  The Court, all creditors, and all parties in interest should have the opportunity to consider the Dismissal Motion prior to any decision on the Conversion Motion.  Mexichem has failed to comply with Local Rule 9013-1(f), which requires that Mexichem have filed a certificate of service with its Conversion Motion.[12] Accordingly, the Court should strike the Conversion Motion, or at a minimum, adjourn the March 28, 2023 hearing thereon or treat it as a status conference, and defer ruling until

---

[12]   In pertinent part, Local Rule 9013-1(f) states:  "Form of Motion. All motions <u>shall have attached thereto</u> a notice conforming to Local Rule 9013-1(e), a proposed form of order specifying the exact relief to be granted, <u>and a certificate of service showing the date of service, means of service and the names and addresses of the parties served</u>."  (emphasis added).  Mexichem's disregard for this critical filing renders it impossible to verify whether in fact Mexichem complied with its obligation to serve the Conversion Motion upon all creditors, as required by Bankruptcy Rule 2002(a)(4).

Mexichem has established that proper notice was given pursuant to Bankruptcy Rule 2002(a)(4), and/or the Court has considered the Dismissal Motion.

## **RESERVATION OF RIGHTS**

36.     This Objection is filed with a full reservation of rights, including the right to amend and/or supplement the Objection in all respects, including based on any new or additional information that the Debtors obtain, and to raise additional arguments at the hearing on the Conversion Motion.

## **LOCAL RULE 9013-1(h) CONSENT**

37.     Pursuant to Local Rule 9013-1(h), the Debtors consent to the entry of a final judgment or order with respect to this Objection if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **CONCLUSION**

For the reasons set forth above, the Debtors respectfully request that this Court enter an order denying the relief requested in the Conversion Motion; and granting such other relief as this Court deems just, equitable and appropriate.

Dated: Wilmington, Delaware
March 21, 2023

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

Joseph O. Larkin (I.D. No. 4883)
Carl T. Tullson (I.D. No. 6704)
Jacqueline M. Dakin (I.D. No. 6650)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com
Carl.Tullson@skadden.com
Jacqueline.Dakin@skadden.com

- and -

Ron E. Meisler (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Robert A. Weber*
Robert A. Weber (I.D. No. 4013)
Mark L. Desgrosseilliers (I.D. No. 4083)
Mark D. Olivere (I.D. No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Weber@chipmanbrown.com
Desgross@chipmanbrown.com
Olivere@chipmanbrown.com

*Co-Counsel to the Debtors and Debtors-in-Possession*